**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No: 3:25-mj-00320-MEO-DCK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | **JOINT MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS COUNTS ONE, TWO, AND THREE** |
| WILLIAM STANLEY and HEATHER MORROW, | |
| Defendants. | |

**Summary of Argument**

The Defendants are charged in a Bill of Information with "entering in and on Federal Property" and committing "disorderly conduct" in obstructing the "usual use" of a parking lot (Count One), "imped[ing] and disrupt[ing]" the performance of official duties (Count Two), and "fail[ing] to comply with lawful directions" (Count Three).  But the evidence is undisputed that the place at where this conduct took place (a roadway leading from a public street to an outdoor parking lot) was not owned by the United States and was not leased by the United States.  Rather, it was owned and controlled by a private limited liability company based in New York.  The regulations cited by the Government in support of these charges were explicitly interpreted by the United States to prohibit only conduct that occurs on Government property, not on property adjacent to Government property.  Thus, the place where the Government charged the Defendants engaged in improper conduct was not "Federal property."  The Bill of Information fails to charge a federal crime for these counts and, therefore, Counts One, Two and Three must be dismissed.

**Factual Background**

The United States alleges that on November 16, 2025, the Defendants each entered "Federal property" located at 6130 Tyvola Centre Drive in Charlotte and committed various offenses. The property at 6130 Tyvola Centre Drive is approximately 7.99 acres. MTD ¶ 9, Ex. 3.[1] At the time of the alleged offenses, the property was owned under a Special Warranty Deed by a Limited Liability Company created under Delaware law named "DHS NC, LLC." MTD ¶¶ 2-3, Ex. 1-2.[2] DHS NC, LLC is a holding company with its principal office in New York, New York, and consists of two individual members. MTD ¶ 5, Ex. 2.

The United States, through the General Services Administration ("GSA"), contracted with the original owners of the property and entered into a lease for the Immigration and Naturalization Service to occupy a building then being constructed on the property. MTD ¶¶ 9-10, Ex. 5. The building initially housed Immigration and Naturalization Service (now part of the Department of Homeland Security) and includes offices, holding cells, conference rooms and hearing rooms.[3]. The lease executed by the United States provided the Government with the right to possess the building (roughly 48,000 usable square feet). MTD ¶ 9, Ex. 5.[4] The remainder of the property is

---

[1] Exhibit 3 is plat filed in the Mecklenburg County Register of Deeds at Book 38, Page 411.

[2] Exhibits 1 and 3 are public records filed with the Mecklenburg County Register of Deeds. Exhibit 2 are Annual Reports filed with the North Carolina Secretary of State and required for out-of-state corporations doing business in North Carolina.

[3] The federal officers whose duties were allegedly impeded or disrupted were members of the Enforcement and Removal Operations, a principal directorate within Immigration and Customs Enforcement, who central function is to arrest, detain, and remove undocumented immigrants.

[4] This Exhibit was provided by the United States in the discovery process. As an executed document of the United States, it constitutes the admission of a party-opponent under Fed.R.Evid. Rule 801(d)(2) and is admissible as substantive proof of the property interest leased to the United States.

owned and remains in the legal possession of DHS NC, LLC. A "site plan" attached to the Lease as an exhibit, depicts the Government's leasehold interest as less than the property as a whole, and confined to what is identified as "INS" or the building that is the subject of the lease.

The public plat for this location was attached to the Motion to Dismiss as Exhibit 3. It shows that Tyvola Centre Drive is a public street and depicts a roadway off of Tyvola Centre Drive which accesses the property. The Land Title Survey in Exhibit 4, shows that the roadway continues up to parking lots which serve the ICE building. It is undisputed that neither Mr. Stanley nor Ms. Morrow were in any of the parking lots at the time of the alleged conduct, nor were they in the ICE building. Rather, they were just beyond the median shown in Exhibit 4 and nearly 100 yards from the ICE building. The entrance to driveway into 6130 Tyvola Centre Drive is not gated from Tyvola Centre Drive and is generally open and accessible to the public. At the entrance there is a signage stating "U.S. Department of Homeland Security." In addition, and on a lawn area roughly 75 to 100 yards from the ICE building, there is a sign prohibiting trespassing (the sign is actually located on private property and not federal land as defined by the lease).

Mr. Stanley and Ms. Morrow, along with a number of other individuals, were on the private roadway off of Tyvola Centre Drive on November 16, 2025, as part of a protest against the Government's "Charlotte's Web" Operation. Mr. Stanley was arrested after allegedly standing in front of an unmarked vehicle containing a masked and plain-clothes Enforcement and Removal agent ("Removal Agent") as he was driving to the building before his shift began. The Removal Agent claims that Mr. Stanley "pounded" on the glass of the truck when it stopped. Video depicts that Removal Agent, wearing a green "hoodie" rushing from the car and yelling "Get over here m-----r f-----r." He grabbed Mr. Stanley and, with another Removal Agent, spun him around and pinned him against another car. Ms. Morrow was tackled as she ran towards Mr. Stanley.

All of these actions were on the roadway. None of the alleged conduct occurred behind the "No Trespassing" sign that had been placed on the lawn of the property. None of the alleged conduct took place in the parking lots on the property.

**Argument**

***There is No Evidence that Mr. Stanley or Ms. Morrow Ever Entered in or on Federal property.***

The United States does not own and has never owned the property located at 6130 Tyvola Centre Drive. At all times relevant to this matter, that property was owned by DHS NC, LLC. Because the United States has never owned this property, the extent of its "property interest" is defined by the Lease (MTD, Ex. 5) that it executed with the prior owners of the property and under which it continues to utilize the building today. That Lease confines the United States' property rights to 52,000 square feet of office space (roughly 48,000 usable square feet) in a building built to the Government's specifications. Other than providing for 29 secure parking spaces, the United States was given no right to exercise exclusive control over any other part of the property.

It is axiomatic that, in matters of leases and the extent of the rights of the United States, the Government is treated like any other party to a lease. That is, a lease is a contract and, nothing else appearing, that contract defines the rights and the obligations of the United States. *See 27-35 Jackson Ave LLC v. United States,* 127 4th 1314 (Fed. Cir. 2025) (interpreting discretionary provision in lease); *Stomness MPO, LLC v. United States,* 134 Fed. Cl. 219 (Fed. Ct. Cl. 2017) (interpreting various lease documents and provisions to define rights and obligations). Indeed, one of the purposes for the Court of Claims is to adjudicate the rights of landowners who enter into lease agreements with the United States. Thus, the Government's property interest extends only to the limits of the Lease and no more. And here, the Government's property interest was confined

to the building and did not extend to the roadway leading to the parking lot. Indeed, the Government's Lease takes great pains to limit its liability to that building and that building only.

Government agencies have, from time to time, promulgated regulations that seek to exert control over property adjacent into their buildings or to Federal property. This is done under statutory authority through regulation. For example, at military bases, the military is given the authority in 33 C.F.R. § 334.1470 to designate a "danger zone" around a base's property, a designation that is published to the public along with a map of the zone. This so-designated "danger zone" is considered part of the military installation for purposes of unlawful entry under 18 U.S.C. § 1382. *See, e.g., United States v. Zenon-Rodriguez,* 289 F.3d 28 (1st Cir. 2002) (holding that part of South Salamis Bay was properly designated as a "danger zone" during naval live-fire maneuvers). Once so designated, the United States is authorized to occupy and control that property during the period it is designated a "danger zone." In short, for military installations, the Government may, with appropriate notice and under properly promulgated regulations, occupy and control property which it does not own or otherwise exclusively control for a designated period of time.

No such right or regulation existed at the time of the alleged conduct for this facility. To the contrary, the regulations that did exist at the time and which were cited in the Bill of Information have since been withdrawn and reserved. These regulations did not extend to actions beyond the "property itself" and did not include property "adjacent" to federal property. 91 FR 2316-01, 2026 WL 129046 (F.R.) (Federal Management Regulation; Conduct on Federal

Property). [5]  In the regulatory explanation for withdrawing these regulations, the Government

noted:

> Prior to the proposed rule, DHS relied upon the regulations government personal conduct on Federal property found in 41 CFR part 102-74, subpart C. ***The FMR is only applicable to property under the jurisdiction, custody, or control of GSA (not all property protected by the Federal Protective Service) and applies only when the conduct is committed on the property itself and not adjacent thereto.*** Accordingly the FMR is not comprehensive of DHS authority under 40 U.S.C. 1315 to protect federal property falling within DHS's jurisdiction.

91 FR 2316-01, 2026 WL 129046 (F.R.) *2316 (Federal Management Regulation; Conduct on

Federal Property January 20, 2026).  Indeed, this was precisely the reason that these regulations

were withdrawn and reserved and incorporated in 2026 to broader regulations.  Moreover, the

former regulations cited by the Government in the Bill of Information did not define "Federal

property" or purport to extend control or occupation by DHS to property in which the United States

did not hold a legally recognized interest.[6]

Title 41 governs these offenses.  There are no provisions in Title 41 which define what

"Federal property" means, let alone including private property as federal property.  Nor do other

places in the United States Code define property to include private property.  For example, in Title

40, relating to Public Buildings, Property, and Works, Congress defined "property" to mean "any

interest in property."  40 U.S.C. § 102(9).  The phrase "interest" means a legally cognizable

interest, since the statute deals largely with the disposition of federal property and surplus property.

Other titles also define "Federal property," with the most expansive definition occurring in 20

---

[5] For ease of reference, the Defendants attach as **Attachment A**, a copy of the Federal Regulatory announcement on January 20, 2026, along with a copy of the regulations that were withdrawn (and are cited by the Government in the Bill of Information).

[6] Because the regulations relied upon by the Government in the Bill of Information were withdrawn in January (and thus are no longer contained in the Code of Federal Regulations), the Defendants have attached a copy of the regulations as **Attachment B**.

U.S.C. § 107e(3) (under Title 20 "Education"). There Federal property is defined as "any building, land or other real property owned, leased or occupied by any department, agency, or instrumentality of the United States." *See Browder v. U.S. Dept. of Educ.,* 2000 WL 1724027, \*2 (U.S. Ct. App. Fourth Circuit, November 20, 2000) ("It is inconceivable that "Federal property" could be defined more broadly . . . . Literally, *any* building, *any* parcel of land, or *any* other piece of real estate constitutes, under this definition, 'Federal property' (provided, of course, that it is owned, leased, or occupied by a federal entity).")[7]

Plainly, this roadway does not meet any of these definitions. The roadway is not owned by the United States. There is nothing in the lease that mentions the roadway, let alone gives the United States rights as a property owner in the roadway (which is a hundred yards from the entrance to the building that the United States leases). Nor has the Government occupied this property under any properly promulgated regulation or public notice. The roadway is, and has always been, private property which the Government (and members of the public) have had a right to use for purposes of ingress and egress. Acts that occur on this roadway may still be crimes, but they are not crimes that occurred on Federal property.

Definitions matter, particularly in criminal cases. And because these Counts are criminal, "the canon of strict construction of criminal statutes, or the rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier,* 520 U.S. 259, 266 (1997). *See United States v. Compas-Serrano,* 404 U.S. 293, 297 (1971) ("It has long been settled that 'penal statutes are to be construed strictly,' and that one 'is not to be subjected to a penalty unless the words of the statute plainly impose it.'"). Because

---

[7] This is an unpublished decision by the U.S. Court of Appeals for the Fourth Circuit and is attached to this Memorandum as **Attachment C**.

definitions matter and are to be construed strictly, this "likely limits how far a court may stray from the plain and ordinary meaning of statutory terms." *United States v. Rodriguez,* 460 F. Supp.2d 902 (S.D. Ind. 2006). *Rodriguez* is illustrative of this legal reality. In *Rodriguez*, the Defendant was charged with possessing a firearm in a federal facility. The statutory term "Federal facility" was defined as "a building or part thereof owned or leased by the Federal government where Federal employees are regularly present." *Id.* at 907. Rodriguez, a postal employee, had been warned that firearms were prohibited on Postal Service property; he was arrested for having a handgun in his car in the parking lot of the Postal Services' Processing and Distribution Center. The Court found no probable cause because the "plain and ordinary meaning of the word 'building' does not include a parking lot," nor could a parking lot be considered a "part" of a building as "the language of the statute cannot be stretched so far." 460 F. Supp.2d at 911, 913.

The presence of a "No Trespassing" warning on the front lawn of the ICE building does not change the result. First, and at best, a "no trespassing" warning is posted at the border of a property and is designed to warn persons not to proceed beyond it. Here, the alleged conduct took place before the sign (and thus before crossing the border). So even if the Government wished to point to such a sign as evidence of its legal interest, that interest still did not include the roadway where the alleged conduct actually occurred. Second, as a matter of legal rights, the Government cannot simply place a "no trespassing" sign on otherwise private property and, in the process, transform the private property into Federal property. Otherwise, any parcel of private property would be subject to becoming "Federal property" regardless of whether it was owned or leased by the Government. While the Government has a right to prohibit trespassing on its property, that property in this case was at the boundaries of the ICE building.

**<u>Conclusion</u>**

For the reasons set forth above, this Court should dismiss Counts One, Two, and Three of

the Bill of Information.

This 31st day of July 2026.

*/s/ James P. Cooney III*
James P. Cooney III (NC Bar No. 12140)
Claire J. Rauscher (NC Bar No. 21500)
WOMBLE BOND DICKINSON (US) LLP
301 South College Street, Suite 3500
Charlotte, North Carolina 28202
Telephone:  (704) 331-4980
Telephone: (704) 331-4961
Email:  Jim.Cooney@wbd-us.com
Email: Claire.Rauscher@wbd-us.com
*Attorneys for Defendant William Stanley*

*/s/ Rob Heroy*
Rob Heroy (NC Bar No. 35339)
Goodman Carr, PLLC
301 S.McDowell St., Ste. 602
Charlotte, NC 28204
Telephone: (704) 372-2770
Email: Rheroy@goodmancarr.net

*/s/ Xavier T. de Janon*
Xavier T. de Janon (NC Bar No. 58803)
P.O. Box 470221
Charlotte, NC 28247
Telephone: (704) 448-9170
Email: xavier@peopleslaw.co
*Attorneys for Defendant Morrow*

WBD (US) 4899-3856-1731